Filed 11/24/15  Wolf v. BMW of North America CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| HENRY WOLF,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>BMW NORTH AMERICA, LLC et al.,<br><br>        Defendants and Respondents. | A141814<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-12-520316) |

Henry Wolf filed a complaint for personal injury and product liability against BMW North America, LLC (BMW) and Corbin-Pacific, Inc. (Corbin-Pacific).  He alleged that he suffered an injury while riding his BMW motorcycle due to the vibrations from his motorcycle's Corbin-Pacific seat.  The trial court granted nonsuit against Wolf's claims, and Wolf appeals.  We conclude that Wolf failed to make a prima facie showing of causation and affirm the judgment.

### BACKGROUND

On April 26, 2012, Wolf filed a form complaint against BMW and Corbin-Pacific for negligence, negligent infliction of emotional distress, and product liability[1] after he suffered "a severe case of priapism (a persistent lasting erection)" after riding for two

---

[1] Wolf's product liability cause of action was based on strict liability, negligent failure to warn, and breach of warranty.  The trial court granted motions for summary adjudication in favor of BMW and Corbin-Pacific as to the strict liability claim based on breach of warranty and denied these motions as to Wolf's other claims.

hours on his 1993 BMW motorcycle equipped with a Corbin-Pacific seat. He alleged that he was no longer able to engage in sexual activity. He asserted that his condition "was caused by the ridge-like seat on his motorcycle, negligently designed, manufactured and/or installed" by BMW and Corbin-Pacific.

Prior to trial, BMW and Corbin-Pacific filed several motions in limine seeking to exclude testimony of Samuel C. McIntosh and Dr. Jonathan S. Rutchik. The trial court denied their request and stated that it "will take up the foundation for their opinion as they testify . . . ." The court admonished: "The plaintiff has a difficult case, because if the plaintiff is correct about how this happened, that the motorcycle vibration in combination with the seat caused the damage to the nervous system that results in permanent erectile dysfunction, it is not established in the medical literature. This hasn't happened before that is documented."

Trial began on March 7, 2014. Wolf testified that he bought the 1993 BMW on September 5, 2009, from Edward Austin. The 1993 BMW was equipped with a custom seat manufactured by Corbin-Pacific. When he bought the BMW, Austin gave him the original BMW stock seat but Wolf never removed the Corbin-Pacific seat.

Wolf testified that he rode the BMW motorcycle at least twice a month between September 2009 and May 2010. His rides generally lasted "an hour or so." Until his two-hour ride that caused his injury, he had not experienced any "erection problems" after riding the motorcycle. He testified that he had owned about 20 or 25 different motorcycles and had been riding motorcycles for about 35 years. He described the overall vibration of this motorcycle in comparison to the others that he had ridden as being "a very buzzy bike. It makes a lot of high-frequency vibrations."

Austin testified that he had frequently commuted from his home to work on the motorcycle he sold to Wolf, and his work was about 38 miles from his home. Most of his commute was on a winding mountain road, and part of it was on a freeway. He never experienced unpleasant vibrations or a priapism from riding the motorcycle.

On Saturday, May 1, 2010, Wolf rode the motorcycle to and from work. Traffic was heavy and it took him over two hours to get to work. He spent about one hour at a meeting, and then his ride home lasted about two and one-half hours.

Once he returned home, Wolf had a few drinks with a friend. He testified that he did not have sex that night. The following morning, Wolf woke up around 9:30 or 10:00 a.m. with an erection. He did not have any penis pain. Two days after his ride, on May 3, 2010, Wolf still had some soreness in his perineum and he went to the emergency room at Marin General Hospital (Marin General). Marin General's initial assessment records stated: "Erection x 24 hours, has occurred in the past but this is the longest[.]" It further provided: "Long motorcycle ride on Saturday (also vigorous sex on Saturday)[.]"

Dr. Jeffrey D. Weitzman saw Wolf. He evaluated Wolf and consulted with an urologist. Dr. Weitzman "aspirated both sides of the corpora cavernosa and irrigated the penis and then attempted oral Ativan and tetracycline." This treatment did not "cause[] the priapism to resolve." The diagnosis was "[p]riapism etiology uncertain."

Dr. Weitzman's notes indicated that Wolf "presents with a persistent erection . . . . The patient states he has been experiencing this intermittently when awakening for the past year, but it usually resolves spontaneously within 5 hours. This time it has persisted longer than ever before." He wrote that, Wolf "notes some soreness in the perineum, which he attributes to a long motorcycle ride on Saturday."

A report signed by Dr. Harry Neuwirth provided the following regarding the history of Wolf's illness: "The patient has a long history of intermittent episodes of priapism. He has never required any treatment, however. He often has prolonged erections however. Two days ago, he had a prolonged motorcycle ride. Yesterday morning, he awoke with an erection and this has not gone down in the last 30 hours."

Wolf was transferred to the University of California, San Francisco Medical Center (UCSF). The report on Wolf's "admission history and physical" stated in pertinent part: "Patient reports he was riding his motorcycle on [May 1, 2010,] over a bumpy road. He noted pain in his perineum. When he woke up on [May 2, 2010,] he had a rigid erection that persisted throughout the day, but decreased in tumescence from

3

100% to only partial erection. He reports that when he awoke on [May 3, 2010,] the erection was again 'rock hard.' . . . Dr. Neuwirth . . . aspirated approximately 200 ml of blood from the penis. This resulted in detumescence with tumescence noted again soon afterward. The patient received tributalene 10 mg x 2 with no detumescence. . . . He reports prior history of priapism that resolved on its own after 7-8 hours, also associated with perineal pain."

Dr. Tom Lue, a urologist, and resident Dr. Alan Shindel performed an ultrasound, which revealed "no to sparse flow in penis consistent with ischemic priapism." Dr. Shindel wrote in the record the following: "The patient gives a history of having prolonged penile erections several times before in his lifetime, the first of these was painful but subsequent recurrences have not been. . . . The patient was seen and evaluated by Dr. Tom Lue with physical examination and color duplex ultrasound. This was demonstrative of little to no flow in the corporal bodies bilaterally. Based on this finding, we suspect venous thrombosis which may be either causing ischemic damage or may easily progress to causing ischemic damage in the near future. We have recommended T shunt formation to alleviate this possibility. [¶] After discussing the nature of the procedure as well as risks (pain, bleeding, infection, persistence of shunt-post-treatment) and benefits (relief of obstruction to blood flow), the patient had substantial trepidation about proceeding. . . . [H]e does not wish [to] have a shunt procedure at this time. He understands that failure to act at this point may pose a risk of erectile dysfunction in the future and he accepts this risk."

Dr. Lue testified that there are three types of priapism and approximately 90 percent were diagnosed as ischemic, or "low-flow" priapism, in which there is no circulation to the penis. A low flow priapism is an emergency because the tissue can die and then "the patient will have no erection the rest of his life." A low flow priapism is usually very painful while a high-flow priapism, which is usually secondary to trauma, is not painful. He stated that he could not state with any reasonable medical certainty that Wolf's motorcycle ride had anything to do with his priapism, and noted, "[S]ome other people may have a different opinion."

4

The following day, May 4, Wolf had a second Doppler ultrasound.  The results showed some blood flow through the right-side artery, but no flow through the left distal corporal body of his penis.  Dr. Lue testified that this ultrasound did not change his diagnosis because it is common to have a period of poor or no circulation and then to have increased blood flow.  This condition is called postischemic hyperemia.

On May 10, Wolf saw  Dr. Jack W. McAninch at UCSF.  Dr. McAninch noted that the sonography demonstrated penile blood flow consistent with high flow priapism.  At trial, he testified that he believed Wolf suffered from high flow priapism.  He had not seen the results of the ultrasound completed on May 3, 2010, which found ischemic priapism, but did see the ultrasound completed on May 4.  In his opinion, Wolf's condition was caused by perineal trauma experienced during the motorcycle ride.  He noted that Wolf had not complained about pain, a strong indicator of ischemic type priapism and a lack of pain was consistent with high-flow priapism.  He believed that the motorcycle ride altered the regulatory mechanism of the blood flow, including the controlling nerves, and that there could be "nerve injury from sitting astraddle of an object, and that can alter the vascular pattern or blood pattern and flow to the penis."

Dr. McAninch acknowledged that he was unaware of any case where a ride on a motorcycle was the suspected cause of priapism.  He had no opinion about the design of the Corbin-Pacific seat.  He could not state with any reasonable degree of medical certainty that Wolf would not have had a priapism if he had not taken the motorcycle ride on May 1.

On May 11, Wolf contacted UCSF and reported a change in his erections; he was advised to return for further evaluation.  Dr. Lue treated him.  Dr. Shindel wrote in the medical record that a t-shunt procedure was recommended for restoration of penile blood flow, but Wolf refused it partly because he was not feeling any penile pain.  Wolf was advised "that there was a risk of long-term erectile dysfunction from ischemic changes to the penis after prolonged priapism."

Wolf presented the video deposition testimony of his expert, Dr. Rutchik, to the jury.  Dr. Rutchik is board certified in neurology and occupational environmental

5

medicine. His practice involved seeing patients with upper extremity injuries caused by vibration in the workplace. He did not treat Wolf, and had never treated a patient with either priapism or genital exposure to vibrations. He also had not evaluated the motorcycle seat and had no opinion regarding its design or ergonomics. He stated that he was not rendering any specific opinion about Wolf or Wolf's condition.

Dr. Rutchik stated that injuries caused by repetitive, occupational exposure to vibration were generally caused by months or years of exposure. He believed that exposure to vibrations could possibly cause injury to the cells and tissues of the perineum or genital area. He researched the medical literature looking for a relationship between priapism and vibration and did not find any instance where priapism was caused by vibration or motorcycle riding.

McIntosh, a structural dynamics engineer, testified regarding the vibration that he measured from the BMW motorcycle. He testified that he had no opinion regarding the design of the Corbin-Pacific seat.

Mike Corbin, the owner and CEO of Corbin-Pacific testified that the seat was designed to place pressure on the femur bones rather than the perineum. He stated that the seat was concave. He was unaware of any other case where the person experienced an erection or priapism from riding a motorcycle.

In January 1993, BMW's Service-Information on the 1993 BMW motorcycle K1100LT[2] complained "of an uncomfortable level of vibration in the handlebars, seat and foot rest area." The service manual explained what adjustments needed to be made and concluded: "We are convinced that this information will help eliminate vibration complaints effectively. [¶] Please remember when discussing complaints with your customers that it is not possible to eliminate all vibrations completely . . . ."

Mark Yeldham, the special product investigation manager for BMW, testified that there was no significant difference between the K1100LT, Wolf's BMW, and the K1100RS for purposes of vibration. BMW bolted both of these motorcycles directly to

---

[2] Wolf had the 1993 BMW K1100RS.

the frame without using rubber motor-mounts. He admitted that other motorcycles used rubber motor-mounts at the time Wolf's motorcycle was designed and sold in the early 1990s. Subsequently, BMW used rubber motor mounts on the K1200 design. He admitted that rubber motor mounts reduced vibration of the motorcycle. He also acknowledged that a balance shaft would reduce vibration.

Yeldham rode Wolf's motorcycle with the Corbin-Pacific seat during an inspection in connection with this litigation. He did not feel any undue pressure on any part of his body while riding and did not notice that the seat had a ridge-like shape. Other than Wolf's claim, BMW had no information that anyone had made a claim alleging priapism as a result of riding a BMW or any other type of motorcycle.

Dr. Robert Kessler, a board certified specialist in urology and Professor of Urology at the Stanford University Medical Center, spent 41 years diagnosing and treating patients afflicted with various urologic conditions, including priapism and erectile dysfunction. He had not seen or heard of a patient developing priapism as a result of riding a motorcycle; he had not read any reports or reviewed any literature indicating that vibration caused priapism.

After the jury heard all the evidence, BMW and Corbin-Pacific moved to strike Dr. Rutchik's testimony. They also moved for nonsuit on the issue of causation. On March 14, 2014, the trial court filed its order striking testimony of Dr. Rutchik and granting the motions for nonsuit.

With regard to striking Dr. Rutchik's testimony, the trial court explained: "Dr. Rutchik offered an opinion on general causation to wit: it is possible that vibration from the motorcycle on the order of magnitude measured by [Wolf's] expert [Samuel] McIntosh could cause injury to neural tissue in the vicinity of the perineum. He offered no opinion on the specific cause of [Wolf's] priapism. Dr. Rutchik based his general causation opinion on a National Institute for Occupational Safety and Health (NIOSH) document which he described as a survey of published scientific literature intended to be used by OSHA for the purpose of standard setting and rule making. The primary inquiry of the document was occupational exposure to hand arm vibration. Hand arm vibration

syndrome is nerve damage secondary to exposure to vibration. Dr. Rutchik testified that he also relied on reports that vibration injury to the feet and legs and two Japanese studies that reported an increased incidence of erectile dysfunction among motorcyclists. . . . Dr. Rutchik testified that neural injury caused by vibration depended on a number of factors including the frequency, intensity and duration of the vibration and the susceptibility of the individual. He relied on no study or report of priapism caused by exposure to vibration. [¶] On this foundation, Dr. Rutchik said it was possible that vibration caused damage to [Wolf's] neural tissue in the vicinity of the perineum. He offered no opinion as to the duration of the exposure that could cause this damages nor did he offer any opinion as to the latency period between exposure and symptoms. He offered no opinion as to how such damage would cause priapism in general. [¶] Dr. Rutchik's opinion on general causation violates Evidence Code [section] 801 in that it is speculative and lacking in foundation. It is stricken."

The trial court ruled that a consequence of striking Dr. Rutchik's testimony was that Wolf had no evidence of causation. Thus, his claims for negligence, strict product liability, negligent failure to warn, and negligent infliction of emotional distress failed. The court added that even if it did not strike Dr. Rutchik's testimony, it would grant the motions for nonsuit because Wolf presented no evidence of specific causation. It noted that no witness testified as to how the vibration Wolf experienced during his four-hour motorcycle ride caused him to suffer a priapism. The court discounted Dr. McAninch's opinion because he is a urologist and unqualified to specify the way in which four hours of vibration would cause an injury resulting in priapism. Furthermore, he did not provide an opinion on how the vibration caused priapism.

On April 3, 2014, the trial court entered judgment in favor of BMW and Corbin-Pacific against Wolf. Wolf filed a timely notice of appeal.

8

## DISCUSSION

### I. *Wolf's Defective Brief*

BMW and Corbin-Pacific contend that we should dismiss Wolf's appeal because his opening appellate brief fails to comply with the rules of appellate procedure. We agree.

California Rules of Court, rule 8.204[3] prescribes the mandatory format requirements for appellate briefs. Rule 8.204(a)(1)(A) provides that the brief must begin with a table of authorities that separately lists the cases, statutes, rules, and other authorities cited. Wolf's opening brief has a table of authorities, but it does not list any of the cases or statutes cited in his brief. Additionally, rule 8.204(a)(1)(C) requires a citation to the record to support any factual reference. Wolf frequently refers to facts and quotes testimony without providing any citation to the record. Additionally, rule 8.208(b) and (d)(1) requires the brief to include a certificate of interested entities or persons. No such certificate appears in Wolf's brief.

Most significantly, Wolf's opening appellate brief contains no intelligible argument. Rule 8.204(a)(1)(B) requires that each point must be supported by argument and, if possible, by citation of authority. After setting forth the facts in 38 pages and the standard of review in almost three pages, Wolf's entire argument challenging the trial court's granting of a nonsuit against his tort claims is the following: "Based on the foregoing legal standards and facts, Appellant's claims for strict product liability, negligence, negligent infliction of emotional distress and all other causes of action were viable so it was error for the trial court to grant nonsuit for lack of causation (see above)." This conclusory statement, which does not set forth the elements of his causes of action, fails to cite any legal authorities, and omits any legal analysis is completely inadequate.

" ' "An appellate court cannot assume the task of discovering the error in a ruling and it is the duty of counsel by argument and the citation of authority to show the reasons why the rulings complained of are erroneous. Contentions supported neither by argument

---

[3] All further rule references are to the California Rules of Court.

nor by citation of authority are deemed to be without foundation and to have been abandoned." ' " (*In re Phoenix* (2009) 47 Cal.4th 835, 845; see also *Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119 [the "failure of an appellant in a civil action to articulate any pertinent or intelligible legal argument in an opening brief may, in the discretion of the court, be deemed an abandonment of the appeal justifying dismissal"].) An appellant must prove that a trial court's rulings are incorrect "by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655.) "One cannot simply say the [trial] court erred, and leave it up to the appellate court to figure out why." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.) The appellate court need not furnish argument or search the record to ascertain whether there is support for appellant's contentions. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.)

Here, Wolf's opening brief failed to make any arguments to support any theory of error. (See *Berger v. Godden, supra,* 163 Cal.App.3d at p. 1120.) "[A]ppellant's failure to present any pertinent or intelligible legal argument in his opening brief constitutes an abandonment of the appeal . . . . In this circumstance, dismissal of the appeal, with no consideration on the merits as to the correctness of the judgment . . . from which the appeal is taken, is the proper disposition." (*Ibid.*)

Wolf did provide some legal argument in his reply brief. However, it is well settled that arguments raised for the first time in an appellant's reply brief are forfeited unless good reason has been shown for failure to raise them. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.) Such arguments deprive the respondent of an opportunity to counter the argument. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.)

Although Wolf's appellate brief is woefully inadequate, we exercise our discretion to consider his appeal on its merits.

## II. *Standard of Review*

A motion for nonsuit operates as a demurrer to the plaintiff's evidence. " 'A

defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit [the trier of fact] to find in his [or her] favor. [Citation.] "In determining whether the plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff[']s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff'[s] favor.' " [Citation.] A mere "scintilla of evidence" does not create a conflict . . . ; "there must be substantial evidence to create the necessary conflict." [Citation.]' " (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 444, italics omitted.)

" 'In reviewing a grant of nonsuit, we are "guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff." [Citation.] We will not sustain the judgment " 'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " [Citation.]' [Citations.]" (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist., supra,* 88 Cal.App.4th at p. 444.)

### III. *Wolf Failed to Present Evidence of Causation*

The trial court granted BMW and Corbin-Pacific's motion for nonsuit on Wolf 's claims for negligence, negligent infliction of emotional distress, and product liability.**4** Wolf claimed that he suffered "a severe case of priapism" that "was caused by the ridge-like seat on his motorcycle, negligently designed, manufactured and/or installed" by BMW and Corbin-Pacific.

Wolf contends that the testimony of his experts—Doctors Rutchik and McAninch—provided sufficient evidence from which a trier of fact could have found

---

**4** Wolf's product liability cause of action was based on strict liability and negligent failure to warn.

11

BMW and/or Corbin-Pacific liable on either negligence or strict product liability theories, under a consumer expectations test. (See *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430.) Under this test, a product is defective in design if it "fail[s] to perform as safely as an ordinary consumer would expect." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 562 (*Soule*).) "[I]n addition to establishing a prima facie case regarding causation, the plaintiff must also produce evidence that the product failed to satisfy ordinary consumer expectations as to safety." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 126.) The consumer expectations test is properly applied in "cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design.*" (*Soule,* at pp. 567-568.)

Any theory of negligence or product liability requires evidence of causation.[5] (See, e.g., *Soule, supra,* 8 Cal.4th at p. 560 [a manufacturer, distributor, or retailer is liable in tort if the defect in the manufacture or design of its product *causes* injury while the product is being used in reasonably foreseeable manner].) The law is well settled that a plaintiff cannot recover damages based upon speculation or a mere possibility that the wrongful conduct of the defendant caused the harm. (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 133; *Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.) Evidence of causation must rise to the level of a reasonable probability based upon competent testimony. (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200.)

Even if we presume that the trial court abused its discretion in striking Dr. Rutchik's testimony and we consider this testimony on the issue of causation, Wolf cannot prevail because his evidence on causation was insufficient as a matter of law. Dr. Rutchik, never treated Wolf, and never treated a patient with either priapism or genital

---

[5] Wolf also asserts that the doctrine of res ipsa loquitur applies, which impacts the burden of producing evidence. Wolf's inability to provide evidence that the seat caused his injury defeats any claim that this doctrine applies. (See, e.g., *Ybarra v. Spangard* (1944) 25 Cal.2d 486, 489 [injury must be *caused* "by an agency or instrumentality within the exclusive control of the defendant"].)

exposure to vibrations. He did not evaluate the motorcycle seat and had no opinion regarding its design or ergonomics. He stated that he was not rendering any specific opinion about Wolf or Wolf's condition. He testified that exposure to vibrations *could possibly* cause injury to the cells and tissues of the perineum or genital area.

Dr. Rutchik's testimony did not establish causation. He had no opinion as to what caused Wolf's priapism, and was able to claim only that there was a possibility that the vibration on the seat caused Wolf's condition.

Wolf also presented the testimony of Dr. McAninch, who opined that Wolf's condition was caused by perineal trauma experienced during the motorcycle ride. Dr. McAninch, however, could not state with any reasonable degree of medical certainty that Wolf would not have had a priapism if he had not taken the motorcycle ride. He acknowledged that sitting on any type of seat could have caused Wolf's injury, and expressed no opinion about the design of the Corbin-Pacific seat. He acknowledged that he had never heard of or encountered a case where a motorcycle ride caused or was suspected of causing a priapism. He did not provide any opinion as to how the vibration caused the priapism. This evidence was insufficient to establish causation as Dr. McAninch did not connect any aspect of the seat design to Wolf's priapism.

Wolf failed to present any admissible evidence that his motorcycle ride or the vibrations from the motorcycle seat caused him to suffer a priapism. Accordingly, the trial court correctly granted a nonsuit on his negligence and product liability claims.

## DISPOSITION

The judgment is affirmed. Wolf is to pay the costs of appeal.

13

_____

Kline, P.J.

We concur:


_____

Richman, J.


_____

Stewart, J.


*Wolf v. BMW North America, LLC et al.* (A141814)